# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**BRENDA PEEK, et al.**

        **Plaintiff,**        **CIVIL ACTION NO. 09-CV-12220**

    **vs.**

                                   **DISTRICT JUDGE ROBERT H. CLELAND**

**COMMISSIONER OF**        **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

        **Defendant.**
_____/

## REPORT AND RECOMMENDATION

**I.**    **RECOMMENDATION:**    This Court recommends that Plaintiff's Motion for Summary Judgment (docket no. 9) be DENIED, Defendant's Motion For Summary Judgment (docket no. 10) be GRANTED and the instant Complaint DISMISSED as the Commissioner's decision is supported by substantial evidence.

\*\*\*

**II.**    **PROCEDURAL HISTORY:**

Plaintiff filed applications for a period of disability and Disability Insurance Benefits and Supplemental Security Income on June 29, 2005 alleging that she had been disabled since October 1, 2001 due to manic depression, bipolar disorder, sleep apnea and suicidal tendencies. (TR 12, 46-48, 75, 87)[1]. The Social Security Administration denied benefits. (TR 348-53). Plaintiff died on

---

[1] Plaintiff's date last insured for DIB was September 30, 2006. (TR 15, 358). With respect to Plaintiff's application for SSI, Plaintiff does not challenge the ALJ's finding that she "did not enter into an agreement with the State of Michigan for reimbursement of welfare assistance if [her] application for supplemental security income was approved. Thus the request for hearing as it pertains to the claimant's application for supplemental security income is

July 3, 2007. (TR 12). Plaintiff's daughter testified at a requested *de novo* hearing held on June 10, 2008 before Administrative Law Judge (ALJ) Peter N. Dowd who subsequently found that the claimant was not entitled to a period of disability or Disability Insurance Benefits because she was not under a disability at any time prior to her death on July 3, 2007. (TR 21, 354). The Appeals Council declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review. (TR 2-4). The parties filed Motions for Summary Judgment and the issue for review is whether Defendant's denial was supported by substantial evidence on the record.

### III.    TESTIMONY, MEDICAL EVIDENCE AND VOCATIONAL EXPERT TESTIMONY

####     A.    Hearing Testimony and Plaintiff's Report

Plaintiff's daughter, Jean Peek, testified at the administrative hearing on behalf of her deceased mother. (TR 354). Ms. Peek testified that she had lived with her mother until her death from a crack cocaine overdose and that Plaintiff had been using crack cocaine for about six months prior to her death. (TR 362). Ms. Peek was unaware of whether Plaintiff had used any other illegal drugs. (TR 362-63). Ms. Peek testified that in the six months prior to Plaintiff's death, Plaintiff secluded herself in her room, did not cook or prepare meals and forgot to pay her bills. (TR 364).

When asked whether Plaintiff had any mental impairments, Ms. Peek testified that "Dr. Benton had diagnosed her with bipolar and severe depression." (TR 363). When asked about physical impairments, Ms. Peek testified that "[t]he doctor had written her out a note that said that she wasn't able to work for more than two hours, wasn't able to stand, or sit, or anything for more than two hours at a time." (TR 363). Ms. Peek testified that she was not sure of the underlying

---

dismissed in part due to claimant's death." (TR 12, 376).

reasons for the restrictions. (TR 363). Ms. Peek testified that she knew that her mother had a heart condition and emotional problems. (TR 363).

Ms. Peek testified that for the period time from 2002 through 2006 Plaintiff did not do anything around the house except sit on the couch and watch television or sit in her bedroom alone. (TR 364-65). Ms. Peek did the grocery shopping, housework and yard work. (TR 366). Ms. Peek testified that she did not think her mother was capable of working full-time due to Dr. Benton's restrictions and because her mother was always complaining about pain. (TR 367). Ms. Peek believed that Plaintiff's last job ended in 2001 when the business closed. (TR 368-69).

Plaintiff has a twelfth grade education. (TR 76, 92). Plaintiff reported that she stopped working on October 1, 2001 due to her physical and mental ailments. (TR 88). She reported that "[i]t is hard to interact with people, I cry all the time. I am mentally and physically tired all the time. It is hard to control my emotions. I tend to forget things." (TR 88). Plaintiff had a face to face agency interview on July 14, 2005 at which the interviewer noted no difficulties, including in walking, standing and sitting. (TR 77). Plaintiff completed a function report dated July 30, 2005. (TR 79-86). She reported that she did not do housework or yard work because they make her "very tired." Plaintiff reported that she did not go out in public alone because she has panic attacks and gets dizzy. (TR 82). She was able to drive and shopped when she had extra money, but reported that she hated being out. (TR 82). She reported that she could walk about one block before she needed to rest for four to five minutes. (TR 84). On a Disability Report Appeal, Plaintiff noted that as of 2005 she suffered severe psychological problems and was suicidal. (TR 94).

**B.    Medical Evidence**

Plaintiff's general care physician was Regis A. Benton, Jr., D.O. (TR 90). The record shows that Plaintiff treated with Dr. Benton from 2002 through May 2007. (TR 153-55). Complaints

3

throughout 2002 and 2003 included sore throat, coughing and persistent hoarseness. (TR 153-55). In August 2003 Dr. Benton completed a State Agency Medical Examination Report and noted Plaintiff's diagnoses as bipolar disorder, depression, coronary artery disease and sleep apnea, and noted two recent hospital admissions for drug-related respiratory arrest. (TR 172). The 2003 Report is set forth in more detail below.

Plaintiff treated with Wayne K. Robbins, D.O., between April and October 2002 for complaints of hoarseness. (TR 156-69). An October 21, 2002 biopsy of a vocal chord polyp revealed keratosis with no evidence of dysplasia or malignancy. Plaintiff was advised to maximize her reflux regime and discontinue smoking. (TR 156, 165-66). On October 22, 2002 Plaintiff reported feeling anxious and "jittery" and unable to relax; Dr. Robbins prescribed Valium at Plaintiff's request and refilled her Phenergan. (TR 157). In January 2003 Plaintiff underwent a nocturnal polysomnography study which revealed mild obstructive sleep apnea with significant arousals in sleep associated with the same. (TR 163).

The record shows a history of drug abuse with repeat hospitalizations in 2003 for overdoses. On March 15, 2003 the diagnosis was a "polydrug overdose with Librium, marijuana and methadone." (TR 209-13). The hospital report notes that Plaintiff reported a history of heroin use. (TR 209). On March 29, 2003 Plaintiff was again admitted to the hospital following unresponsiveness. (TR 206-08). The diagnosis was methadone overdose, depression disorder and probable suicide attempt. (TR 207). On July 19, 2003 Plaintiff was again found unresponsive and admitted to the hospital. (TR 203-05). The diagnoses were aspiration pneumonia, non ST-segment elevation myocardial infarction and bipolar disorder. (TR 203). Plaintiff was again admitted on August 17, 2003 following a change in mental status with reduced responsiveness. (TR 181-201). A toxicology screen was negative and the treatment provider reported that "methadone does not

4

routinely test positive on an opiate drug screen." (TR 181). The impression noted was methadone overdose. (TR 183).

In September 2003 Plaintiff was examined by Gary L. Weber, D.O., F.A.C.C., following referral from Dr. Benton for complaints of chest pain. (TR 130-31, 146-47). The doctor noted Plaintiff's report of daily anterior chest heaviness lasting for hours and radiating to the left side of her neck and left axilla, and improved by nitrates. (TR 146). Dr. Weber diagnosed atypical chest pain, uncontrolled hypertension, substance abuse, bipolar depression and sleep apnea syndrome. (TR 147). He ordered a stress echocardiogram and blood work. (TR 147). In December 2003 Plaintiff complained of "unbearable" low back pain causing numbness in her legs and increased urination. (TR 138). An x-ray of the lumbar spine revealed minor spurs, normal disc spaces and no fracture, dislocation or destructive process. (TR 142).

In June 2004 Dr. Benton diagnosed Plaintiff with pharyngitis, sleep apnea, bipolar disorder and chronic bronchitis following continuing complaints of sore throat and cough. (TR 137). Plaintiff requested Valium to help her relax. (TR 137). A July 14, 2004 stress echocardiogram revealed "negative maximal exercise test for myocardial ischemia, left ventricle hypertrophy with normal segmental wall motion and ejection fraction and fair exercise functional capacity." (TR 128). As set forth in further detail in the analysis below, Plaintiff continued to treat with Dr. Benton through May 2007. (TR 270-75, 288-309, 334-42). Dr. Benton prescribed Valium and Vicodin during 2006. (TR 270-73).

On August 10, 2004 Dr. Robbins again examined Plaintiff for complaints of hoarseness and odynophagia. (TR 175). Dr. Robbins reported that Plaintiff continued to smoke but reported cutting back from two packs per day to one. (TR 175). The doctor found Plaintiff's report of whether or not she was using the proton pump inhibitor unclear; Plaintiff first said she was off it, and later in

the examination said she was still taking it. (TR 175). Dr. Robbins performed a nasopharyngoscopy which revealed "significant swelling in the posterior glottic region suggestive of persistent gastroesophageal reflux disease, as well as bilateral vocal cord edema consistent with Ranke's edema secondary to her smoking." (TR 175). The doctor "strongly advised" Plaintiff to avoid tobacco use, decrease her weight with exercise and avoid meals close to bedtime. (TR 175).

Plaintiff underwent a psychological medical examination on August 10, 2004 with Matthew P. Dickson, Ph.D., L.P. (TR 148-51). Dr. Dickson noted Plaintiff's report that she was addicted to Vicodin the prior year. (TR 148). Dr. Dickson concluded that Plaintiff's "psychological condition would moderately impair her performance of work related activities." (TR 151). He diagnosed her with bipolar disorder not otherwise specified (296.80) and a history of prescription drug abuse (Vicodin) and assigned a GAF of 53. (TR 151). The doctor reported that Plaintiff is "cognitively able" to manage her funds and noted a "history of substance abuse." (TR 151).

Plaintiff underwent a state agency examination and evaluation with Gregory F. Hackel, D.O., on August 27, 2005. (TR 225-27). On examination, Dr. Hackel noted no evidence of joint laxity, crepitance or effusion and Plaintiff had no difficulty with getting on and off the examination table, heel and toe walking, squatting and hopping. (TR 226). She had full range of motion in all joints. (TR 226). Plaintiff's gait was normal and without the use of an assistive device. (TR 226). The doctor diagnosed sleep apnea and advised that Plaintiff needed to continue using her CPAP mask but he noted "no clinical deficit from her sleep apnea at this time." (TR 227). He also noted Plaintiff's complaint of a past heart attack, but physical examination was unremarkable and the history for ongoing angina was "somewhat inaccurate." (TR 227). He reported that she needed a psychiatric evaluation and that her bipolar disorder appeared to be the "greater problem." (TR 227).

6

On August 29, 2005 Plaintiff underwent a state agency psychological evaluation with Walter R. Drwal, Ph.D, L.L.P. (TR 228-40). At the beginning of the examination, Plaintiff engaged in three different indices of effort and validity: The Dot Counting Test, the Test of Memory Malingering and the Computerized Assessment of Response Bias. (TR 229-231). Based on her results, Dr. Drwal concluded that "it appeared that [Plaintiff] exerted an embellished effort and she was likely engaging in a high degree of symptom magnification. . . . Therefore, the complaints and deficits noted by Ms. Peek in the formal examination portion of this examination are also likely to be suspect." (TR 231). The doctor noted that Plaintiff "presented, subjectively, as someone who was embellishing frequently throughout the evaluative process," and gave examples where he thought she was embellishing. (TR 235). Dr. Drwal reported that mental activity was spontaneous and unblocked, speech was fluent and coherent, and thought processes were logical, coherent and goal directed. (TR 236). Dr. Drwal diagnosed a history of depression and a GAF of 79. (TR 239). He concluded that "[t]here is nothing presented that would socially or psychologically prevent [Plaintiff] from seeking, obtaining, and maintaining gainful employment." (TR 239).

A state agency medical doctor completed a Physical Residual Functional Capacity Assessment dated September 14, 2005 on which he concluded that Plaintiff can lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk six hours of an eight-hour workday and sit about six hours of an eight-hour workday and is unlimited in the ability to push and pull except as limited for lifting and carrying. (TR 260-68). Plaintiff is limited to performing postural activities only occasionally and should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. (TR 262, 264). The evaluator concluded that the medical evidence does not support Plaintiff's allegations regarding her physical limitations. (TR 265).

Rom Kriauciunas, Ph.D., L.P., completed a Psychiatric Review on September 27, 2005 and concluded that Plaintiff has mild restrictions in activities of daily living and mild difficulties in maintaining social functioning and maintaining concentration, persistence or pace and has had no episodes of decompensation. (TR 246-59). He diagnosed a history of depression and a GAF of 79. (TR 249).

In December 2005 Plaintiff reported to the emergency room with vomiting and chills. (TR 311-32). An x-ray of the abdomen revealed mild arthritic degenerative changes in the lower lumbosacral spine and no abnormally dilated loops of bowel. (TR 326). There was no acute intrathoracic disease and no bowel obstruction or pneumoperitoneum. (TR 326).

Plaintiff died on July 3, 2007 at 52 years of age. (TR 122). The cause of death listed on the Certificate of Death is drug abuse. (TR 122).

### C. Vocational Expert

The Vocational Expert (VE) testified that Plaintiff's past work as an office manager was semi-skilled and sedentary (noting that Plaintiff did not supervise anyone so it was not exactly as the DOT defined it), as a data entry clerk was semi-skilled and sedentary, as a sewing machine operator was unskilled and light and as a cashier was unskilled and light. (TR 372).

The ALJ asked the VE to consider an individual of Plaintiff's age at the time of her death, her education and past work experience, who could lift a maximum of twenty pounds, frequently lift ten pounds or less, stand and walk six of eight hours in a workday, sit for six of eight hours in a workday, occasionally climb stairs, balance, stoop, kneel, crouch and crawl, who needs to avoid concentrated exposure to machinery vibrations, and who has no mental impairments of a severe nature which would cause limitations in the individual's ability to perform work activities. (TR

373). The VE testified that such an individual could perform all of Plaintiff's past work except for sewing machine operator, due to the machinery vibrations. (TR 373).

The ALJ then asked the VE to consider an individual with the same physical limitations, but who was also limited by mental impairments to doing simple, routine, and repetitive activities in a stable work environment and able to tolerate superficial contacts with supervisors and co-workers but unable to work with the general public. (TR 373-74). The VE testified that such an individual could not perform Plaintiff's past work. The limitation to simple and repetitive work would preclude semi-skilled work and the need to avoid machinery vibrations and public contact would preclude the sewing machine operator work. (TR 374). The VE testified that there are jobs in the national economy which such an individual could perform including dishwasher (4,000 jobs in the lower peninsula of Michigan region), which is unskilled and light, janitor (8,200 in the region) and grounds maintenance worker (1,900 in the region). (TR 374). The VE agreed that his testimony was consistent with the DOT except as he previously noted. (TR 375).

## IV. ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although Plaintiff met the disability insured status requirements through September 30, 2006, had not engaged in substantial gainful activity between October 1, 2001 and the July 3, 2007 date of her death and suffers from drug and alcohol abuse and addictions with history of drug overdoses causing respiratory arrests in March 2003, July 2003, August 2003 and July 2007 with a history of depression and bipolar disorder, restrictive airway disease with a history of cigarette smoking and complaints of gastric reflux and pulmonary congestion, arthritis of the lumbar spine with low back pain, cardiac left ventricular hypertrophy and hypertension, at times uncontrolled, and sleep apnea, all severe impairments, she does not have an impairment or combination of impairments that meets or equals the Listing of Impairments. (TR 15-17). The ALJ

found that prior to Plaintiff's death on July 3, 2007 she retained the ability to perform a limited range of light exertional work activities and that if she stopped the substance abuse which caused her mental impairments, she would continue to have a "severe" combination of physical impairments however, she would have been able to perform her past relevant work. Therefore she was not suffering from a disability under the Social Security Act prior to her death on July 3, 2007. (TR 21).

## V. LAW AND ANALYSIS

### A. Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial

evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

    **B.**    **Framework for Social Security Determinations**

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

    (1)    she was not presently engaged in substantial gainful employment; and

    (2)    she suffered from a severe impairment; and

    (3)    the impairment met or was medically equal to a "listed impairment;" or

    (4)    she did not have the residual functional capacity to perform her relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. *See id.* at §§ 404.1520(g), 416.920(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987).

Plaintiff argues that the ALJ erred in failing to properly assess the medical opinion of Dr. Benton, and, as a result, the ALJ posed an inaccurate hypothetical question to the VE.

    **C.**    **Analysis**

*1.*    *Whether the ALJ Properly Evaluated the Treating Physician's Opinion*

Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's treating physician Dr. Benton's medical opinion. It is well settled that the opinions and diagnoses of treating physicians are generally accorded substantial deference. Under 20 C.F.R. sections 404.1527(d)(2) and 416.927(d)(2), the ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. The Sixth Circuit has stated that "[i]n general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters*, 127 F.3d at 529-30. The ALJ must give specific reasons for the weight given to a treating source's opinion. *See* SSR 96-2p, 1996 WL 374188. Whether a medical opinion is "not consistent" with other substantial evidence is not limited to a comparison with other medical opinions, but considers all evidence of record, for example, statements by other individuals about the claimant's actual activities. *Id.* at *3.

Plaintiff specifically argues that the ALJ improperly discounted Dr. Benton's June 17, 2008 Physical Medical Source Statement opinion in response to a question asking "[h]ow many hours per month [out of 160 hours] would the above limitations likely disrupt a regular job schedule with low physical demands?"; the doctor responded "160 hrs." (TR 342). On this check-box form, Dr. Benton also concluded that Plaintiff could lift and/or carry a maximum of twenty pounds occasionally and less than ten pounds frequently, stand and/or walk for two hours of an eight-hour day and sit for less than six hours of an eight-hour day. (TR 342).

As an initial matter, the ALJ states in his decision that Dr. Benton believes that Plaintiff could "stand and walk 2 of 8 hours and sit less than 8 hours in a potential work setting." (TR 20). The 2008 form is slightly unclear, but it appears that Dr. Benton's opinion was that Plaintiff could sit less than 6 hours. (TR 342). The ALJ concluded in his decision that "[t]his suggests that Dr.

12

Benton believes the claimant before her death had some abilities to do work activities, though, perhaps, not on a full-time 8 hour a day basis." (TR 20). For this reason it appears that the ALJ's reference to the less than "8" hour standing/walking limitation was a typo because the ALJ recognized that the exertional limitations set forth by Dr. Benton resulted in less than a full 8 hour day of combined walking, standing and sitting[2].

The ALJ specifically pointed out that with respect to Dr. Benton's conclusion that Plaintiff's limitations would disrupt her work schedule for 160 hours per month, the form contained no supporting diagnosis or reference to other information to support this conclusion[3]. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The "diagnosis" area of the form was left blank. (TR 342). Plaintiff argues that "Dr. Benton's medical records and office notes are littered throughout the medical records of evidence and show his treatment of Ms. Peek from at least July 30, 2003 through May 2, 2007." (Docket no. 9 at 11).

The ALJ fully considered Dr. Benton's medical records and the only record which the ALJ failed to adopt was the Source Statement at issue. Tellingly, Plaintiff does not identify specific medical records which show physical impairments of a severity to support the Source Statement conclusions. With respect to the remainder of Dr. Benton's opinions, and contrary to Plaintiff's assertions, the ALJ fully considered them and specifically explained his rationale to the extent that he did not adopt the doctor's 2008 finding of disability and limitations. "Although a treating

---

[2] Plaintiff did not challenge the ALJ's misstatement of the exertional limitations.

[3] The Court also notes that Plaintiff's brief alleges that "Dr. Benton opined that Ms. Peek would miss 160 hours out of a 160 hour work month." (Docket no. 9 at 10). The language on the form to which Dr. Benton responded asks for the hours per month that the limitations would "likely disrupt" a regular job schedule. (TR 342). Dr. Benton did not opine that Plaintiff would "miss" 160 hours of work per month.

13

physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

In February 2005 Plaintiff complained of congestion and a heavy feeling in her chest. (TR 292). In 2005 the majority of Plaintiff's complaints to Dr. Benton were for coughing, chest congestion and a "heavy" feeling in the chest. (TR 289-92). In February 2005 Dr. Benton diagnosed chronic bronchitis and chronic obstructive pulmonary disorder. (TR 292). The doctor prescribed Amoxil, Albuterol and Phenergan and Advaid. (TR 292). The ALJ pointed out that chest x-rays ordered by Dr. Benton in February, March and April 2005 were normal. (TR 16-17, 301-303). A spirometry test (pulmonary function testing) on March 11, 2005 revealed only mild restriction. (TR 304). A chest x-ray on June 7, 2006 was also normal and revealed "no change" and a spirometry test of the same date indicated only mild restriction. (TR 277-78).

The ALJ also pointed out that in January 2006 Plaintiff complained of lower back pain and an x-ray of the lumbar spine showed "minor spurs" but disk spaces were "well-maintained" and there was no fracture, dislocation or destructive process. (TR 280). Plaintiff was prescribed Vicodin. (TR 273). In February 2006 Plaintiff again complained of low back pain and Dr. Benton renewed her Vicodin and Valium prescriptions. (TR 272). In October 2006 Plaintiff again complained of low back pain and was prescribed Naprosyn. (TR 306). In December 2006 Dr. Benton reported that Plaintiff had stopped taking her medication and she was fatigued and depressed. (TR 338).

It appears that Dr. Benton last treated Plaintiff in May 2007 at which time he refilled her medications including Levothyroxine, Abilify, Lamictal, Lisinopril and Lexapro. (TR 335). He noted that Plaintiff had bipolar disorder and was being treated with medication by "psych at Hurley." (TR 335). The ALJ pointed out in his decision that the record does not contain mental health

14

documentation to support this statement. (TR 20, 335). The ALJ's conclusion that the extreme limitations set forth in the 2008 Medical Source Statement were not supported by diagnoses or other objective medical evidence is supported by substantial evidence.

The ALJ also pointed out that Dr. Benton's conclusion that Plaintiff's work schedule would be disrupted 160 hours per month was in direct contradiction to the exertional physical limitations which he set forth, including lifting, carrying, sitting, standing and walking, which showed the aforementioned belief that Plaintiff had at least some capacity for work, if not full-time, prior to her death. The ALJ also pointed out that Dr. Benton "does not appear to have ever considered the claimant's drug and alcohol abuse and addiction on her abilities to have done work activities." (TR 20). Plaintiff argues that the 2008 form was a "physical" source statement and Dr. Benton was disabling Plaintiff from a physical standpoint. (Docket no. 9 at 11). The Court agrees with the ALJ that the form is unclear as to what impairments were considered, including whether mental impairments were considered, despite the title on the form. Dr. Benton failed to cite diagnoses and his conclusion that Plaintiff's impairments would "disrupt" 160 hours of work from 160 hours per month is inconsistent with his exertional findings, which suggest she can participate in work activities for some period *less than* a full eight hours per day.

Plaintiff's argument that Dr. Benton's 2008 opinion is consistent with his August 2003 opinion is not persuasive. The record contains a form completed by Dr. Benton dated August 6, 2003 which notes that Plaintiff has physical limitations expected to last more than 90 days, including toleration of less than two hours per day each of standing, walking and sitting. (TR 171). The form notes no limitations to lifting or carrying, and notes that Plaintiff can engage in repetitive simple grasping, reaching and fine manipulating with both upper extremities, but cannot engage in pushing and/or pulling. Plaintiff may operate foot and leg controls with both lower extremities. (TR 171).

First, Dr. Benton's August 2003 form predates an administratively final initial determination dated September 3, 2004, so while it is considered in the review of the entire record, the prior determination was a denial. (Docket no. 13, 171). The 2003 form contains diagnoses of bipolar disorder, depression, coronary artery disease and obstructive sleep apnea and noted two recent hospital admissions for respiratory arrest related to drug use. (TR 172). It cited an electrocardiogram as supporting data and also stated that Plaintiff was scheduled for a cardiac work-up, which had not yet occurred. (TR 172). Finally, Dr. Benton's 2008 opinion shows an improvement in the ability to sit over the August 2003 opinion. (TR 171, 342).

Dispositive administrative findings relating to the determination of a disability and Plaintiff's RFC are issues reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e). The ALJ "is not required to accept a treating physician's conclusory opinion on the ultimate issue of disability." *Maple v. Comm'r of Soc. Sec.*, 14 Fed. Appx. 525, 536 (6th Cir. 2001); *see also* 20 C.F.R. § 404.1527(e). The ALJ did not err in failing to adopt Dr. Benton's conclusory answer that Plaintiff's work would be disrupted for 160 of 160 hours per month without further supporting medical evidence. The Court finds that the ALJ properly considered Dr. Benton's treatment records and fully explained his decision not to adopt Dr. Benton's 2008 Medical Source Statement. (TR 16-17, 20, 171). The ALJ's findings are supported by substantial evidence.

2. *Whether the Hypothetical Question To The VE Was Accurate*

Plaintiff argues that because the ALJ failed to properly evaluate Dr. Benton's opinion, the hypothetical question posed to the VE did not accurately portray Plaintiff's impairments. In a hypothetical question posed to the VE, an ALJ is required to incorporate only those limitations which he finds credible and supported by the record and the ALJ did so. *See Casey v. Sec'y of Health and Human Servs.,* 987 F.2d 1230, 1235 (6th Cir. 1993). The ALJ's decision not to give

controlling weight to Dr. Benton's opinion that Plaintiff's impairments would interrupt her work for 160 of 160 hours per month and the standing and sitting limitation is supported by substantial evidence. Therefore, the ALJ was not required to include Dr. Benton's limitations in his hypothetical question. Plaintiff has not otherwise developed an argument that the RFC findings by the ALJ were not supported by substantial evidence or that the hypothetical question to the VE omitted work-related impairments other than Dr. Benton's 2008 opinion[4].

The ALJ found that, based on all of Plaintiff's impairments, she had the RFC to perform a limited range of light exertional work activity[5] including occasional climbing of stairs, balancing, stooping, kneeling, crouching and crawling, avoiding concentrated exposure to fumes, odor, dusts and gases and with limitations related to mental impairments to performing simple, routine and repetitive work activities in a stable work environment, tolerating superficial contact with supervisors and coworkers and no work with the general public. (TR 18).

---

[4] Plaintiff did not develop her statement at the end of her brief that the ALJ "does not appear to evaluate or decide upon either the credibility of the witness [Plaintiff's daughter, "Ms. Peek] that did testify or the reports of Ms. Peek [Plaintiff], which she filled out when she was among the living." (Docket no. 9 at 12). To the extent that this is meant to be an argument, it is completely undeveloped. It is also incorrect. The ALJ begins his discussion of background and evidence by citing the testimony of Ms. Peek and further relies on Ms. Peek's testimony to establish Plaintiff's mental condition prior to her death. (TR 12-13, 18). There is no basis to conclude that the ALJ did not find Ms. Peek (Plaintiff's daughter) credible or otherwise failed to consider her testimony. Plaintiff identifies no report by Plaintiff which, if relied upon, would result in limitations greater than those found by the ALJ.

[5] "Light" work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). The ALJ's finding that Plaintiff can engage in the exertional requirements of "light" work activity is supported by substantial evidence, including the September 14, 2005 state agency evaluation. (TR 260-68).

The ALJ properly considered Plaintiff's drug abuse in his decision. 42 U.S.C. § 423(d)(2)(C). Plaintiff does not challenge findings related to her mental impairments or the ALJ's finding that Plaintiff's drug abuse was a contributing factor material to his determination that she was disabled. The ALJ presented the limitations to the VE in the form of two hypothetical questions– one including and one excluding the mental limitations. The VE testified that with the mental limitations, such an individual could not perform Plaintiff's past relevant work, but without the mental limitations, such an individual could perform all of Plaintiff's past relevant work except that of a sewing machine operator. The ALJ properly relied on the VE's testimony in his decision and the ALJ's decision that Plaintiff retained the RFC to perform all but one of her past relevant jobs is supported by substantial evidence.

## VI. CONCLUSION

The ALJ's decision was within the range of discretion allowed by law and there is insufficient evidence for the undersigned to find otherwise. Plaintiff's Motion for Summary Judgment (docket no. 9) should be DENIED, Defendant's Motion for Summary Judgment (docket no. 10) should be GRANTED and the instant Complaint DISMISSED.

**REVIEW OF REPORT AND RECOMMENDATION**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation. *Willis v. Sec'y*

of Health and Human Servs., 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: June 2, 2010        s/ Mona K. Majzoub
                           MONA K. MAJZOUB
                           UNITED STATES MAGISTRATE JUDGE

**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: June 2, 2010        s/ Lisa C. Bartlett
                           Case Manager